# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ASSURANCE COMPANY OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 06-1432 |
| v. | ) ) ) | Chief Judge Ambrose<br>Magistrate Judge Caiazza |
| ST. PAUL FIRE AND MARINE INSURANCE COMPANY, *et al.*, | ) ) ) | |
| Defendants. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I. RECOMMENDATION

It is respectfully recommended that the Plaintiff's Motion for Summary Judgment (Doc. 19) be denied.

### II. REPORT

**BACKGROUND**

The Plaintiff Assurance Company of America ("Assurance") has brought this declaratory judgment action against St. Paul Fire and Marine Insurance Company ("St. Paul"), the law firm Meyer, Unkovic & Scott, LLP ("MUS"), and the firm's attorneys Michael Yablonski, Esq. ("Mr. Yablonski") and Kevin McKeegan, Esq. ("Mr. McKeegan"; collectively, "the MUS Defendants"). *See generally* Compl. (Doc. 1). Assurance is the MUS Defendants' commercial general liability ("CGL") and commercial umbrella carrier, and St. Paul provides their professional liability coverage. *See* Pl.'s Facts (Doc. 20) at ¶¶ 3-4.[1]

---

[1] The undersigned relies on the Plaintiff's statements of fact only to the extent they are not meaningfully disputed.

This case addresses whether Assurance, St. Paul, or both insurers are responsible for covering the defense and indemnity costs of claims brought against the MUS Defendants in <u>Rock Ferrone, *et al.*</u>, v. Dan Onorato, *et al.*, Civil Action No. 05-484 (W.D. Pa.) (Ambrose, C.J., Caiazza, M.J.) ("<u>Ferrone</u>"). *See generally* Compl. at "Preamble"; Pl.'s Facts at ¶ 9. That case currently is on appeal before the Third Circuit Court, and portions of it have been refiled in state court. *See* Pl.'s Facts at ¶ 9.

In <u>Ferrone</u>, the plaintiffs' claims against the MUS Defendants related primarily to their representation of SE Technologies, Inc. ("SETech") in a Pennsylvania state court action ("<u>SETech</u>"). *See id.* at ¶ 5 (providing state court docket information). The case "arose out of the alleged failure of the [plaintiffs] to pay for various services provided by SETech, an environmental engineering firm." *Id.* at ¶ 6.[2]

In <u>Ferrone</u>, the allegations against the MUS Defendants, as stated in second amended complaint, included the following:

> ¶ 4   A conspiracy existed between Messrs. Yablonski, McKeegan, and others to "tortiously interfere with and commercially disparage the [p]laintiffs";
>
> ¶ 80  Certain "co-conspirators" made efforts to prevent the plaintiffs from obtaining loan proceeds to settle the SETech case because Mr. Yablonski, on behalf of SETech, "was more interested in the property at Sheriff's sale";[3]

---

[2] Although the Defendants take issue with Assurance's attempt to summarize <u>SETech</u>, the court finds the above statement a fair characterization for the purposes of this litigation.

[3] In another related case, this court explained that the <u>Ferrone</u> plaintiffs brought "a series of state and federal claims . . . alleging among other things that [the defendants] improperly prevented and/or delayed the release of [government] loan disbursements covering the development costs of an airport and business park in West Deer Township." *See* Report & Recommendation in Civil Action No. 05-303 (W.D. Pa.), *adopted by Dist. Ct.* on Oct. 9, 2007.

¶ 84    The SETech Court signed an order drafted by Mr. Yablonski allowing the plaintiffs to perfect their appeal upon depositing $468,575.37 into the Prothonotary and submitting the written opinion of Allegheny County's Solicitor that the "transfer [was] legal and enforceable";[4]

¶ 86    The County, at the behest of Mr. Yablonski, prevented the submission of the appeal deposit contemplated above;

¶ 88    The plaintiffs secured the deposit by other means, and around the same time Mr. McKeegan "solicited the real estate company marketing the project" to cause "legal actions" to be filed against the plaintiffs;

¶ 91    At the behest of Mr. Yablonski and others, the County intervened in the plaintiffs' SETech appeal and its Director of Economic Development, Dennis Davin, submitted a false declaration therein;

¶¶ 95-97  Messrs. Yablonski and McKeegan, as employees of MUS, made efforts to prevent the plaintiffs from funding the SETech settlement by "disrupt[ing their] contractual relations" with lending institutions; among other things, Mr. McKeegan contacted Sky Bank and solicited and received the plaintiffs' sensitive financial information and froze their accounts;

¶ 105   Messrs. Yablonski and McKeegan acted in "concert[]" with the County and others to prevent loan disbursements and "ensure that every aspect of the project would receive stagnation and impediments";

¶ 107   In contacting Sky Bank, Mr. McKeegan sought to "interfere with the [p]laintiffs' contractual relations" and harm their "good will" because he had "recently agree[d] on [the] price . . . [another] client, Robert Fay, would pay [the] Bank for the property, $2,300,000.00"; this caused Sky Bank to call in the plaintiffs' notes and seek foreclosure on the secured property.

---

[4] The Ferrone pleadings suggested that Mr. Yablonski "intentionally" required the legal opinion of the County Solicitor because he knew it would not be provided. *See id.* at ¶ 89; *see also id.* at ¶ 109.

*See* 2d Am. Compl. in <u>Ferrone</u>. Based on these and other allegations, the plaintiffs claimed the MUS Defendants were liable for tortious interference, defamation, misrepresentation, seeking to advance their personal pecuniary interests over the public's, invasion of privacy, and civil conspiracy to commit commercial disparagement and other torts. *See id.* at ¶¶ 126, 128, 132, 139-40, 145-47.

Although the alleged actions of Messrs. Yablonski and McKeegan appear to beg a claim for professional liability coverage, MUS instead chose to proceed under Assurance's CGL policy. *See generally* Pl.'s Facts at ¶ 16. And while the MUS Defendants' summary judgment papers make only passing reference to it, the elephant in the room is the $50,000.00 deductible required under St. Paul's policy. *See, e.g.*, Pl.'s Br. (Doc. 21) at 21; St. Paul's Opp'n Br. (Doc. 24) at 6-7 (arguing that, if contribution is owed for Assurance's defense/indemnity costs, MUS should pay through its $50,000.00 deductible).

In any event Pennsylvania law is clear that, if both policies covered the <u>Ferrone</u> litigation, it was the MUS Defendants' prerogative to choose. *See* Pl.'s Br. at 23 (when more than one policy covers incident, insured may decide one under which to seek defense/indemnification) (citing and quoting <u>J.H. France Refractories v. Allstate Ins. Co.</u>, 626 A.2d 502, 508, 510 (Pa. 1993)). The inquiry, then, is whether the allegations in <u>Ferrone</u> fell within Assurance's CGL policy.

The most pressing issue is whether the Assurance policy created a duty to defend. *See generally* Pl.'s Br. at 2. "[T]he obligation to defend arises whenever the complaint filed by the injured party <u>may potentially</u> come within the coverage of the policy." <u>Heffernan & Co. v. Hartford Ins. Co. of Amer.</u>, 614 A.2d 295, 298 (Pa. Super. 1992) (citations omitted, emphasis

added).  If this modest standard is met, the insurer must defend the claims even if the underlying allegations are "groundless, false, or fraudulent."  Nationwide Mut. Fire Ins. Co. v. McNulty, 1997 WL 805165, *5 n.2  (E.D. Pa. Dec. 30, 1997) (citing binding Pennsylvania authority).[5]

MUS focuses on "Coverage B" of the Assurance policy, regarding "Personal Injury and Advertising Injury Liability."  See MUS Defs.' Br. (Doc. 23) at 5-12.  Among other things, those provisions cover injuries arising out of:  "[the p]ublication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services"; and "[the p]ublication, in any manner, of material that violates a person's right of privacy."  Id. (quoting Assurance's policy).

As seen above, the Ferrone plaintiffs' most recent amended pleadings specifically averred that the MUS Defendants "defam[ed]" them, conspired with others to commit "commercial disparagement," and invaded their privacy.  See discussion supra.  These allegations easily satisfy the "potentially [falling] within the coverage of the policy" standard, and it matters not whether they ultimately are "groundless, false, or fraudulent."  Id.

Assurance nevertheless urges the court to parse the claims and conclude, as a matter of law, that the Ferrone allegations did not include the "publication" requirement under Coverage B.  See Pl.'s Br. at 14-15 (arguing that, while plaintiffs "nominally" brought invasion of privacy

---

[5]  In describing the analogous law of another jurisdiction, the Third Circuit Court noted:

> That the claims are poorly developed and almost sure to fail is irrelevant to the insurance company's initial duty to defend. . . .  Liability of the insured . . . is not the criterion; it is the allegation . . . of a cause of action which, if sustained, will impose a liability covered by the policy.

Federal Home Loan Mort. Corp. v. Scottsdale Ins. Co., 316 F.3d 431, 445 (3d Cir. 2003) (citations to New Jersey law, internal quotations, and alterations omitted).

claim, allegations actually stated tort of intrusion upon seclusion, which does not require publication). Such a ruling, however, would require legal sufficiency analyses under 12(b)(6) or a similar Federal Rule; delving so deeply into the merits is inconsistent with the duty-to-defend standards referenced above. *See* discussion *supra*; *see also* Duff Supply Co. v. Crum & Forster Ins. Co., 1997 WL 255483, *6-7 (E.D. Pa. May 8, 1997) (rejecting claim of no duty defend because insurers "incorrectly base[d] their arguments on the [legal] merits of [the] potential claims," rather than "the factual allegations pled in the underlying complaint").

Even were Assurance to assail the specific factual underpinnings in Ferrone, the court currently sees no basis for concluding they do not potentially fall within the policy's coverage. Admittedly, the allegations in Ferrone are unwieldy and less than a picture of clarity. But neither Assurance nor the court has been able to show or determine that the plaintiffs have failed to allege sufficient facts to support claims for defamation, commercial disparagement, or invasion of privacy.[6] These facts, coupled with the modest legal standards identified above, preclude a finding of no duty to defend. *Cf.* discussion *supra* ("[t]hat the claims are poorly developed and almost sure to fail is irrelevant to the . . . initial duty to defend").

---

[6] Notably, this court did not reach the merits of the plaintiffs' tort claims when presiding over Ferrone. *See* Order in Civ. Action No. 05-484 dated Jan. 19, 2007 (dismissing plaintiffs' federal claims and declining to exercise supplemental jurisdiction over state law claims). The plaintiffs' tort claims have been refiled in state court, moreover, and a finding of non-viability here may threaten the comity owed to that court as well as the Third Circuit. *See, e.g.*, Bituminous Cas. Corp. v. J&L Lumber Co., Inc., 373 F.3d 807, 814-15 (6th Cir. 2004) (district court abused its discretion by hearing insurer's diversity action seeking declaration of no duty to defend because, among other things, "the same underlying factual issues . . . were pending" in state court and exercise of federal jurisdiction "could create friction between the state and federal" tribunals).

Assurance next argues that the Ferrone allegations fall under Coverage B's "Lawyers Professional Exclusion." *See* Pl.'s Br. at 17 (quoting policy). Among other things, that provision excludes coverage for "[t]he performance of professional services for others in the insured's profession as a lawyer." *Id.*

While certain, if not most, of the acts allegedly taken by Messrs. Yablonski and McKeegan undoubtedly qualify as "professional [legal] services," others do not.

As far as the court can tell, Assurance's policy exclusion does not define the term "professional services." "[W]here a professional liability policy does not contain its own definition, . . . courts sitting in Pennsylvania have found . . . the phrase ['professional services'] . . . ambiguous and, therefore, [it] must be construed against the insurer." Biborosch v. Transamerica Ins. Co., 603 A.2d 1050, 1056 (Pa. Super. 1992).

Through its interpretation of Pennsylvania law, the Third Circuit Court also has recognized a distinction between the professional aspect of legal practice and the business aspect:

> [T]he practice of law, as other similarly regulated professional activity in today's world, has two very different and often overlooked components -the professional and the commercial. The professional aspect . . . obviously involves the rendering of legal advice to and advocacy on behalf of clients for which the attorney is held to . . . certain minimum professional and ethical standards. The commercial aspect involves the setting up and running of a business, *i.e.*, securing office space, hiring staff, paying bills and collecting on accounts receivable, etc., <u>in which capacity the attorney acting as businessperson is held to the same reasonable person standard as any other</u>.

Harad v. Aetna Cas. & Sur. Co., 839 F.2d 979, 985 (3d Cir. 1988) (emphasis added). The commercial aspect of a professional enterprise includes business development activity,

such as advertising and competition for clients and referrals. *See, e.g.,* Sampathacar & Jayalakshmi v. Sun Ins. Co., 1992 WL 1071457, 25 Phila. Co. Rptr. 593, 606-607 (Pa. Comm. Pl. Jul. 21, 1992) (holding, in reliance on Harad, that "advertising clearly falls within the business component of running a professional practice," and professional services exclusion therefore did not apply); *see also* Visiting Nurse Ass'n of Greater Phila. v. St. Paul Fire & Marine Ins. Co., 65 F.3d 1097, 1102 (3d Cir. 1995) (claims that health care provider "conspired with hospitals to monopolize referrals" and interfered with others' "prospective contractual relations with patients" related to business operation, not professional practice, because "[s]imilar allegations could be made against any business competing for referrals or customers") (citing Harad, emphasis added); *cf. also* Westport Ins. Corp. v. Jackson, 2005 WL 2300358, *6 (M.D. Pa. Aug. 19, 2005) (where underlying action claimed defamation, commercial disparagement, negligence, and professional malpractice, court construed policy against insurer because allegations that attorney "volunteered to give a legal opinion as to [the] competency and honesty of" company allowed reasonable minds to differ regarding whether such conduct "amounted to the rendering of 'legal services'") (citations omitted).

In Ferrone, the plaintiffs allege conduct that fairly may be characterized as business development activity. Specifically, they claim the MUS Defendants engaged in the aggrieved conduct in furtherance of a plan to present business opportunit(ies) to Robert Fay. *See* discussion *supra* (Mr. McKeegan sought to "interfere with the [p]laintiffs' contractual relations" and harm their "good will" because he had "recently agree[d] on [the] price . . . [another] client,

Robert Fay, would pay [the] Bank for the property").[7] The teachings in Harad, Sampathacar, and Visiting Nurse, coupled with the court's obligation to construe the undefined term "professional services" against Assurance, precludes the entry of summary judgment under the subject exclusion.[8]

Having concluded that Assurance has had, and continues to owe, a duty to defend Ferrone under the CGL policy,[9] issues remain regarding its claims against St. Paul for contribution and indemnity. As the Plaintiff correctly observes, the MUS Defendants' election to proceed under the Assurance policy creates "no bar against [the] insurer['s] obtaining a share of indemnification or defense costs from [St. Paul] under . . . the equitable doctrine of contribution."

---

[7] Robert Fay's precise relationship with the MUS Defendants is not clear from the pleadings in Ferrone. Even assuming Mr. Fay was an existing client, Mr. McKeegan's alleged provision of a business opportunity, to further the Firm's "personal pecuniary interests," *see id.*, is more akin to business development activity than "the heart of the type of services an attorney provides to his clients," namely "the rendering of legal advice to and advocacy on behalf of clients" under "certain minimum professional and ethical standards." Harad, 839 F.2d at 984-85; *see also* Visiting Nurse, 65 F.3d at 1102 (conduct relates to business operation, not professional practice, where "[s]imilar allegations could be made against any business competing for referrals or customers") (emphasis added).

[8] The undersigned is cognizant of the decision in Home Ins. Co. v. Greenfield & Chimicles, 1999 WL 286440 (E.D. Pa. May 5, 1999), as well as the cases cited therein. *See id.* at *7 (collecting cases, from various jurisdictions, holding that "professional services" may extend to acts taken in furtherance of lawyers' personal interests). Greenfield itself is distinguishable, in that the aggrieved conduct was the filing of lawsuits, an act "inherent to the legal profession." *Id.* Most of the other cases were decided under the laws of other jurisdictions, and therefore are less instructive than Harad, Sampathacar, and Visiting Nurse. Finally, the few cases cited from Pennsylvania did not confront the "business development" issue presented here and, in any event, the undersigned sees little benefit to comparing and contrasting those decisions given the fact-intensive nature of the inquiry.

[9] The court's determinations regarding the CGL policy render moot Assurance's arguments under the umbrella policy. *See* Pl.'s Br. at 19 (umbrella coverage is implicated only if "underlying insurance" does not apply).

*See* General Refractories Co. v. First State Ins. Co., 500 F.3d 306, 313 (3d Cir. 2007) (citations and internal quotations omitted).

The court may quickly dispose of Assurance's theory that its rights of contribution and indemnity are dictated by the filing of the second amended complaint in Ferrone. *See* Pl.'s Br. at 24-25 (claiming right of contribution from date it tendered Ferrone to St. Paul until filing of second amended complaint, when it became clear CGL policy provided no coverage; and seeking "full indemnification" thereafter). As seen above, even the second amended complaint in Ferrone did not establish Assurance owed no duty of defense, so any claims for contribution remain unsettled.

The court also may reject St. Paul's assertion that it owes no duty of contribution as a matter of law. *See generally* St. Paul's Opp'n Br. None of the cases cited or arguments advanced by counsel address Assurance's clear right to seek contribution under J.H. France. Assurance's timely reservation of rights letters preserved its claims for contribution, and St. Paul offers nothing of substance to the contrary. *See* Pl.'s Reply Br. (Doc. 27) at 6-7 *and* n.10 (citing supportive authority).[10]

Having reached the above conclusions, the undersigned questions what more can be done at this time. Given the pendency of the Ferrone allegations, both in state court and before the

---

[10] Also without merit is St. Paul's suggestion that it owes no duty of contribution because of MUS's deductible under the professional liability policy. *Compare* St. Paul's Opp'n Br. at 6-7 (given $50,000 deductible, "the MUS Defendants are responsible for reimbursing Assurance for any defense costs incurred") *with* Koppers Co., Inc. v. Aetna Cas. & Sur. Co., 98 F.3d 1440, 1454 (3d Cir. 1996) ("[u]nder J.H. France, the insured gets indemnified first . . . and then the insurers may seek to redistribute the burden among themselves"). Any rights or liabilities regarding the deductible run between the MUS Defendants and St. Paul, and the latter has identified no reason to limit Assurance's contribution rights based on this consideration.

Third Circuit, the full extent of Assurance's defense costs and potential indemnification responsibilities are now indeterminable. Assurance has provided no clear guidance on how defense costs, already paid or to be incurred in the future, should be prorated under its contribution theory. Any declaration regarding indemnification, moreover, would necessarily require the presumption of facts that have not and may not come to pass.

Even were Assurance to engage in further motions practice regarding contribution, the undersigned would be hesitant to recommend that the District Court issue judicial declaration(s) in a vacuum. Until the Ferrone litigation is resolved, at both the state and federal levels, any ruling(s) regarding the prospective rights of these insurers would be decided without the benefit of the full picture[11] and may tread upon the prohibition against advisory opinions. *See generally* discussion *supra* ("[u]nder J.H. France, the insured gets indemnified first . . . and . . . the insurers [later] may seek to redistribute the burden among themselves"); *compare also id.* (noting that Assurance's potential duty to indemnify hinges on outcome of underlying litigation) *with* KCCP Trust v. City of North Kansas City, 432 F.3d 897, 899 (8th Cir. 2005) (opinion is "advisory" if "it rests upon contingent future events that may not occur") (citations and internal quotations omitted).

Last is the more fundamental issue of whether the court should even be hearing this case given the pendency of Ferrone claims in state court. As seen above, Assurance already has

---

[11] As counsel are aware, "[t]he duty to defend exists [only] until such time . . . it is determined that the claim is confined to a recovery that the policy does not cover." Bombar v. West Amer. Ins. Co., 932 A.2d 78, 87 (Pa. Super. 2007). Any future argument(s) by Assurance that the duty to defend has expired may well require additional court intervention, as St. Paul and/or the MUS Defendants again may resist the Plaintiff's position. Thus, any current judicial declaration regarding contribution will not appear to resolve with finality the parties' potential rights and liabilities going forward.

invited the District Court to rule on the legal sufficiency of state law claims asserted by the Ferrone plaintiffs. Although the undersigned has recommended that such determinations should not be made here, none of the parties have addressed the potential comity concerns presented by the adjudication of this declaratory judgment action while the underlying claims remain pending. If, for example, the District Court (or Third Circuit Court on appeal) determines that an examination of the facts or legal claims in Ferrone is appropriate and necessary in this case, any rulings on these matters "could create friction between the state and federal" tribunals. *See* discussion *supra* (citing and quoting Bituminous Casualty, 373 F.3d at 814-15); *but see* Nationwide Mut. Fire Ins. Co. v. Cassel, 881 F. Supp. 133, 135 (M.D. Pa. Sept. 27, 1994) (federal courts "will generally grant declaratory relief in cases involving insurance coverage even though a state court suit against the insured on the underlying claim has not been resolved") (citation omitted).

Given the rulings recommended above, the court is left with little suggestion or guidance on how to proceed. Accordingly, the parties are instructed to include in their objections to this Report proposal(s) for how this case should move forward. The possibilities include, but are not limited to: additional motions practice to determine whether appropriate judicial declarations regarding contribution, proration, *et cetera*, may be entered; staying this case pending resolution of the underlying Ferrone claims in state and federal court; or dismissing this case without prejudice pursuant to the discretion bestowed under the Declaratory Judgment Act.

Once the parties have been heard, the court will be in a better position to assess how the case should proceed. Resistance to any proposal may be had though responses to objections, and counsel remain free to confer and pursue an acceptable resolution by agreement of the parties.

For all of these reasons, the Plaintiff's Motion for Summary Judgment (Doc. 19) should be denied, consistent with the instructions in this Report.

In accordance with the Magistrate's Act, 28 U.S.C. § 636 (b)(1)(B) and (C), and Rule 72.1.4 (B) of the Local Rules for Magistrates, objections to this Report and Recommendation are due by February 4, 2008. Responses to objections are due by February 22, 2008.[12]

January 10, 2007

Francis X. Caiazza
U.S. Magistrate Judge

cc (via email):

Louis A. Bove, Esq.
Francis J. Deasey, Esq.
Michael L. Magulick, Esq.
Frederick J. Francis, Esq.

---

[12] The objection and response deadlines have been extended to account for the additional responsibilities identified above. No further extensions will be granted.